And Mr. Page, we'll hear from you. May it please the Court? The Government has premised its mail fraud prosecution in this case on a scheme to obtain property rather than a scheme to deprive another of property. But the Supreme Court has repeatedly explained that the portion of 1341 referring to schemes to obtain money or property from another through false pretenses does not set forth an independent offense and that it does not fall within the terms of the statute unless there is also an intent to deprive the victim of property. The Government has thus sought conviction based on an all-but-inactive prong of the statute. Specifically, the Government has sought... Well, what would you say to the argument that withholding information or providing false information on the applications in which it bore on whether the insurance company would approve the application or not, and they did approve it based on the false information, result in deprivation of property, a scheme to deprive of property? Well, there might be more than one kind of deprivation at issue. What would you say to that theory, though? I mean, is that theory plausible or implausible? The theory is plausible if the Government could— it might be plausible if the Government could rely on the payment of death benefits, for example. On what? If it could rely on the payment of the death benefits, for example, as a deprivation of property. Why couldn't it? Because the charge— I mean, the scheme is to deprive them of property. And it doesn't have to be that the money immediately went into his pocket or anything, but they deprived him. He got this commission because he made representations on a policy that otherwise would not have been bought. There are several reasons that that theory of prosecution is not available to the prosecution in this case. The first one is that it is excluded by the charge, which says that it is not sufficient to show that the defendant received any other benefit other than commissions or deprived another of any money other than the commissions. The Government affirmatively disclaimed on page 300 any intent to rely on the payment of death benefits as the benefit in this case. And also on 299 and 393, which signaled to Bademore that he need not prepare a defense to that theory of prosecution. Well, I'm going to ask you, are you effective in saying that the Government introduced no evidence to support this? I mean, such as experts that would say this is the same thing here as someone misrepresenting a smoker as a non-smoker. The insurance company would have taken the non-smoker, but it was a misrepresentation. Here, they would have taken an old man who was wealthy and could finance his own plans, but they would not take someone who was poor and could not, who was being taken advantage of and was going to sell the policy. They would not have taken that policy. What's the difference between the misrepresentation of a smoker and a non-smoker and someone who, in the same sense, is less insurable than someone if they made the accurate representations? There's two important differences. One is that misrepresentation as to the applicant's qualification for insurance misrepresents, poses a danger that the insurance company will pay money out of its own pocket that it's not required to pay. And whereas what happened in this case of misrepresentation as to the suitability on a financial basis for insurance doesn't change the risks to the insurance company. It merely enables the defendant to collect pass-through commissions. This is the only issue in this case, the only one presented by the government in the charge related to his commissions. It had nothing to do with the premiums or the issuance of the policy, but how he obtained commissions. Precisely, and that is the second difference, is that that misrepresentation only permitted him, either misrepresentation would permit him to acquire commissions, but the commissions did not start out as the insurance company's money. The insurance company has a right not to be, it may well have a right not to act as a pass-through for ill-gotten gains, but that's not a property right. There's no deprivation to the insurance company because they are forced to take a portion of the ill-gotten premiums and give them over to Baysmore as commissions. Was there no argument made by the government besides the commissions that the property loss, the part of the scheme to defraud, was the fact that the insurance company had been deprived of higher premiums? Was that argument not made? I mean, the higher the risk, the higher the premium, so if there was fraud in misrepresenting these people, they would have priced it differently. Was that never focused on? No, Your Honor, I don't think that the misrepresentation, first of all, no, the misrepresentations in this case were of the financial status of the individual, so those would not tend to reduce the premiums available to the, the misrepresentation that the applicants had a lot of money would not tend to reduce the premiums that the insurance companies would charge. Well, but they were defrauded into believing that. They were defrauding into believing, the evidence supports that they were defrauding into believing that the applicants were wealthy when they really were not wealthy. So why wouldn't a property loss be the fact that if they knew that these people were not wealthy, they would have charged higher premiums? I mean, you seem, you seem to be focused on the commissions component. Well, the, there is not evidence that indicates that they would be charged higher premiums if, if the, if the. So that wasn't part of the government's case. Right, there was some evidence about the kinds of things that insurance companies focus on to set premiums, but they were age and health. Well, again, the way this case was charged and tried, it had only to do with his commissions, right? Precisely, precisely. So, so the fact that they could have received higher premiums is also not an authorized theory of, theory of the charge. In other words, it seems to me that all the questions that I may have asked you would be properly answered by what Judge Wiener just said, and that is that the government is limited to the indictment, to the charging instrument, which charged the only loss of property was the premiums. Is that right? It's, it's limited by the commissions. Yes, Your Honor, it's limited by several things. It's limited by the indictment, which says that the object of the scheme was to receive commissions. It's limited by its own representations on pages 299, 300, and 393, which affirmatively disavowed any other theory of deprivation in the case, which creates problems of fair notice, potentially judicial estoppel if we are going to allow them to rely on other theories now. And it's excluded by the charge, which says it's not sufficient to convict to show that the defendant harmed some other party or harmed the insurance companies in some other way. And the fact that the court's intent was to prevent reference to payments from the investors such as rescission of the policy or death benefits is clear on pages 1763 and 1765. The law is clear that the government may not rely on theories of prosecution that are not authorized by the charge. That's McCormick versus the United States cited in the brief. Now, the government has argued that there is no requirement of an intended loss to the victim as an element of mail fraud. And it relies on that proposition chiefly on United States versus Judd, 1989. I want to point out, first of all, that Judd predates Cleveland, Skilling, and Loughran, which all, I think, make clear that a reaffirm McNally's textual holding that a scheme to obtain property by itself is not sufficient to bring something within the mail fraud statute. I would also distinguish Judd on the grounds that Judd says that it's okay to charge the jury that mail fraud may be premised on either a loss to the victim or a gain to the defendant, but there wasn't even that charge here. The charge here on page 412 defines a scheme to defraud as a scheme intended to deprive another of money or property. So the charge here doesn't even sustain the argument that the government wants to make in support of the prosecution. Well, all the government had to prove was a specific intent to defraud, right? That's right. They don't have to prove an actual loss. But the scheme to defraud alleged in the indictment that they're limited to by the factors I just mentioned was specifically to obtain commissions. And obtaining commissions is not a scheme to defraud an insurance company because those commissions are merely the downstream incarnation of the premiums that the insurance companies wouldn't have had but for the scheme. There might be a very fine mail fraud prosecution here alleging a deprivation to the banks or the lenders who are ultimately paying for all of this or ultimately receive the premiums, but that's not an authorized theory of prosecution in this case. Well, they weren't transferred until two years when they became irrevocable. Is that correct? The policies were not transferred to the investors. That's right. That's right. They were not. So that could be a problem with that theory of prosecution. But the limited theory of prosecution here, which is that the defendant's scheme to receive commissions does not allege a deprivation to the insurance company. Now, I would like, if I can, to answer the government's last filing, which suggests that the cash value of the policies plus the commissions might be equal to the premiums. And I would respectfully suggest that the portion of the record cited on that score does not support that contention. Well, that's an actuarial claim anyway, isn't it? These were actuarially based premiums, commissions, and policy proceeds. Yes, they were. And so we can assume that those actuarials would not have issued the policies on the basis of accurate health information unless they believed they were going to make a profit. So that's strong evidence that the total expenditures to the insurance companies were greater than all of their expenses. But the government focuses as well on this testimony from Mr. Livingston, who is a Transamerica representative. And he says, the way I understand Universal Life Products work, any additional funds that we receive, that's over and above the commissions, would go into the policy as an investment in the policy, which would then increase the cash value of the policy. So it's not necessarily Transamerica. It's also benefiting the insured. So the government, as I understand its last filing, understands this passage to say that all of the money in excess of the commissions becomes the money of the insured. And I don't think that's what the passage says. What the passage says is that that money is also benefiting the insured. In other words, there is some cash value to the policy at the moment that it's purchased. But it doesn't say, it doesn't compare that to all the premiums received and say that the expenses to the insurance company are more than the premiums that it's already received. In fact, the very next question to this witness rebuts that contention. The witness then goes on to testify to the question, well, I guess what I'm getting at, sir, if Transamerica gets $345,000 in, and just in my example it pays $233,000 out, then Transamerica has more money than it did when it started off with. The answer, right, as far as whether that's Transamerica's money or partly to the value of the insurance company, I couldn't, there is that. So I think it's clear that the witness is not saying that all of the money above the commissions belongs to the insured. There is still money that goes to the, leftover that goes to the insurance company, so we cannot say that the commissions represented the money of the insurance company. They were probably the money of the bank or the lender, so there was no deprivation to the insurance company. With that, I would save time for rebuttal. Okay. Thank you, sir. We'll hear from the government now. Mr. Romani. May it please the Court, Andrew Romani for the United States. As irrelevant here, the mail fraud statute required the government to prove two related elements, an intent to defraud, and a scheme to defraud that was aimed at the money or property rights of another. The evidence in this record is unquestionably sufficient to satisfy both of those elements. I know, but you, it does set out the scheme, but then after you set out the scheme, you then set out specific counts upon which he was convicted, and each of those counts specifies specifically that the money taken was the commission, and so if the commission does not constitute deprivation of money or property, then the government has not proved its case. Would you agree with that? I don't disagree that the object of the scheme was commissions and that there needed to be some deprivation of those commissions to show a scheme to defraud. I think that's separate from the specific intent element, which I think is unquestionably satisfied here under United States v. Judd, but let me talk about I think really the heart of the issue, which is this deprivation. The Supreme Court has made clear that the phrase money or property in the mail fraud statute has to be construed broadly. It doesn't extend to schemes that target intangible rights standing alone, but at the same time, it's not limited to schemes that are capable of causing a strict monetary loss. I think that's clear from the Supreme Court's decision in United States v. Cleveland. Well, it has to be a monetary loss and maybe something else, but there has to be some kind of monetary property involved in it. It's what the statute says. I think the language of the case is there needs to be interference, there needs to be some effect, there needs to be something that implicates the property rights of another that doesn't necessarily need to be a strict monetary loss. I mean, the way I take the defense's theory in this case is the mail fraud statute basically looks at on a grand basis. Is there more money coming in the door than going out the door? The problem with what you just said is it can be property or property rights other than cash, but all you have tried this man on is the commissions, which is straight money. I think if you look at the scheme to defraud, what the indictment alleges is effectively that these insurers were tricked into paying commissions for something they expressly told Mr. Bazemore we don't want. We don't want insurers that don't qualify, that don't satisfy our criteria, and when somebody pays money for something they don't want, they never get that money back. Well, the insurers didn't pay any money. The insurers did not pay any money, that's correct. Yeah, he paid that. He paid the premium. Well, a bank paid the premium. Well, but still, it's not the insurer, and it's not the insurance company. The insurance company got the money, out of which they paid the commissions, and the commissions, again, I don't want to sound like a broken record, but that's all that he was prosecuted for. And I think really the court's question goes to this idea that these commissions never really belonged to these insurers in the first place. We fundamentally disagree with that, because if you step back and think about this argument, he's saying premiums go in the door, my commissions are paid out of those premiums, and therefore, because I created the premiums, I've never really taken anything from these insurance companies. But what do the premiums represent? The premiums are nothing more than the realized economic value of the insurer's policy, which indisputably constitutes their property. I mean, the scheme here was to trick an insurance company into selling their property, their insurance policy, effectively forcing them to liquidate it, and then keeping a portion of the profits for himself under fraudulent pretenses. That clearly impacts the insurer's rights in that property and that money. In effect, these insurance companies had earmarked a certain portion of the profits, the sales price of their policy. Okay, what kind of evidence did you put on to show that? That is the scheme. No, but what kind of evidence did you put on to establish the scheme that it was to deprive people of these abstract property rights? Well, I believe that the... It's part and parcel of the same evidence. When somebody... Well, what is that? The evidence here is that these insurance companies were forced to pay commissions for something they didn't receive. Insurers that they expressed and said, we don't want to insure these people. Mr. Bazemore was paid for bringing in that business that he did not want. That is the evidence throughout this trial. That deprives these insurers of their right to control how money is spent. That's exactly what United States v. Cleveland says. It says that it doesn't have to be a strict monetary lawsuit. The mere fact that the Wall Street Journal loses its rights of exclusivity and its confidential business information, it's intangible property. Supreme Court says that's enough to show a scheme to defraud because it's affected their rights. It's their property. They get to decide how to use it. And when you interfere with that, you've shown a scheme to defraud. I think it's also clear from the Supreme Court's decision in United States v. McNally. I mean, there the court contrasted the government's flawed theory of intangible rights with allegations that the Commonwealth was deprived of how they spent their money. And the court emphasized, these are not allegations in the case. There's no evidence of this. It strongly suggested that had that evidence been there, there would have been a scheme to defraud. What testimony did the jury hear about the effect that this misrepresentation, these type of policies that the insurance didn't want? What did the insurance company witnesses say as to why this would affect their economic interests? I think with the insurance policies that the insurers testified to, we would not have entered these policies had we known. Why? Did they say what the damage would be? Because we don't want to be involved in the business of stolen policies. Yes, but did they say what difference that made to them? They said... Economically. It impacts their guidelines in terms of how much of a policy they're willing to issue. And that's at page 1400. So it went into the calculus of the level of death benefits they were willing to give. But I think we're wrong to focus exclusively on the economic issue. And looking at this in terms of a net monetary loss, that is not what the mail fraud statute requires. Well, there has to be a material representation that affected this property interest, this economic interest. I'm just trying to find out what the testimony was explicitly defining that. I think what the testimony was is that these insurers had policies. Remember, these policies, it's just like their inventory. It's not like these insurers have an unlimited number of policies they can issue. Because as soon as you issue a policy, you need to put the face amount of the policy into reserves. That's at record 960 to 962. So every new policy that these insurers issue brings them one step closer to buffing up against the limits of the reserves, one step closer to the point where they're no longer going to be able to issue any policies. And I think that that's an important point because the policy itself is a tangible economic product to these insurers. So, I mean, the argument is that the statute requires deprivation of property or money. Yes. And that when they paid the commissions under false pretenses, that was deprivation of their property. Absolutely. It was deprivation of their property because... Because he got the money that they would not have released except for the misrepresentation. That's exactly right. And the money is the product of the sale of their policy under fraudulent pretenses. It's not like Mr. Bazemore had a thin air. He took their property, their policy, he forced them to sell it to somebody he didn't want, which created liquidity in that product, and then he kept a portion for himself under fraudulent... The only misrepresentation was as to the personal net worth of the applicant to be the insured. There was no health misrepresentation, no age misrepresentation. It was only as to net worth. And the testimony on that by the insurance companies or the government's witnesses who were from the insurance company was that, well, maybe if they'd been that rich, they would have had better medical care and they would have lived longer. Now, is that the only basis for depriving property? Yes, that is correct, Your Honor. But there's no question that these representations were material, because both insurance company representatives said we would not have issued these policies had we known that these people were living on Social Security instead of the fact that they had $20 million worth. I thought they said they also would not, they would not have issued the policies if they had known they were going to be sold under the old folks program. That's absolutely correct, too. There was misrepresentations about net worth. There was misrepresentations about the intentions to what to do with these policies. And the testimony was very clear. These insurers didn't want to be involved in stolen policies. That's why they asked the question, is there any intention to transfer this? But I want to step back to this property. Did they explain to the jury why that was harmful to them? They, yes. Saying I don't want to issue these kind of policies is one thing. Well, there's, first of all, the testimony was that there are significant regulatory and legal ramifications for issuing stolen policies. Yes, insurance companies. Did they expressly say, we do not deal in stolen policies? Yes, it was explicit. If we had known that these policies were going to be resold, we would not have issued the policy. Absolutely. That's clear. It's absolutely clear from the record that these insurers would not have issued these policies. So whenever he failed, omitted that representation. Correct. They gave their property to him on false pretenses. That is the fraud. That is the commission. The object of the scheme is the commissions, but the means of the fraud is to misrepresent things to these insurance companies which they unquestionably say are material, force them to sell a policy to somebody that they didn't want, and then to keep part of the profits under fraudulent pretenses. So think about what the transaction would look like without the fraud. What does it have to do that he keeps part of the property? Well, think about what the transaction... He just deprives them of the property, and that's all the statute requires. That's absolutely correct. Where the money goes after that doesn't matter. That's correct, Your Honor. But think about how these transactions would work in the absence of the fraud. These insurers would sell the policy through an honest broker. They'd receive the exact same premiums, but then the portion of those premiums that they'd always intended to use for commission payments would go for their intended purpose. And we note in the 28J letter when courts have squarely addressed this issue, they've consistently held that depriving somebody of their right to control how money is spent is cognizable mail fraud. It's discussed extensively in United States v. McNally. It's discussed extensively in United States v. Ratcliffe. I don't know. I think probably putting a little gloss on what you've said, though, is if they spend their property in a way they otherwise would not have spent, because they would have spent the money the same way, there's no defrauding. It's just unquestionable. They would not have paid commission. I understand that. I'm just talking about how you stated the case. Will the record show that it was tried that way to the jury, or just it was tried that he got them to issue the policies, and when the premiums were paid, he got the commission? It was all on the commission. It was all on the commission, but what are the commissions? The commissions weren't created out of thin air. The commissions are the... I mean, it's effectively if you go to a used car lot and steal a car from somebody and sell it for $100 and keep $10 for yourself and give them back $90, you deprive them of the value of their car. That's effectively what they did because these insurers had earmarked a portion of the incoming premiums for commission payments. They didn't pay you commissions to go out and find insurers that satisfy our criteria, and these insurance applications were riddled with misrepresentations, and maybe you think about this from a breach of contract perspective. I mean, Mr. Basemore says, well, the reason in this case that we can trace the premiums in the manner that he urges, the reason that it's relevant that more premiums were coming in the door than commissions were going out the door is because a contract required a commission payment. But the day that he submits these insurance applications to these companies, he materially breaches the contract, which obviously excuses the insurer's performance. They no longer have an obligation whatsoever to pay him commissions, but nothing about that prevents them from collecting premiums on a separate insurance contract with the insurer. So if you think about it from that perspective, the money, of course, is fungible, and you don't know where the money that he got came from. But the money, theoretically, came from the premiums that were paid. So, I mean, it was like they... He didn't deprive... I mean, if you're going to dance on the head of a pin, he didn't deprive them of their money. He just took back the money for his commission from the premium. So... It was a suspensive condition to the payment of the premium that they received. I mean, the commission that they received the premium first. I would agree that that would be correct if we could say that these premiums were produced completely by Mr. Bazemore's sale, that nothing was taken from the insurers to get the premiums. But the premiums only exist because he defrauded them into issuing a policy. And the policy is effectively their inventory, because they don't have an unlimited product. I mean, this is just how all other businesses operate. They sell a product for a social good and they make a profit. That's what insurers do with insurance policies, and they don't have an unlimited number of policies because every time they issue a product from that, we're supposed to go to one purpose. Mr. Bazemore forces them to pay it for something they expressly say. We don't want to pay for that. That's nothing more than depriving somebody of their right to control how their money is spent. And I would be briefed to find that there's any case that has rejected that as a valid theory of mail fraud. It's not honest service fraud as Mr. Bazemore contends in his brief. Let me turn to one. Even if this court agrees that the mail fraud statute requires a strict economic loss, and again, I think if you look at United States v. Cleveland, you will see that the Supreme Court expressly rejects that as the standard for mail fraud. But even if the court believed it, United States v. Cleveland rejects the notion that a scheme to defraud has to cause a monetary loss. The court there took a case encompassing a bundle of rights and said that... In plain language, the statute doesn't require it either. Exactly. In plain language, the statute requires obtaining money or property. But let me get to this factual point before I run out of time, if I may. Even if this court assumes that the mail fraud statute requires a strict monetary loss, there is evidence in this record to some extent to cover that obligation. And if that's the case, it is clear that they suffered a deprivation, even in a strict monetary sense, even if the government would concede every legal point that Mr. Bazemore is making. We don't disagree that most of the evidence here shows more money coming in the door than going out the door. But I think the relevant question is what portion of those premiums are coming in from Mr. Bazemore. Then it's clear that they suffered a deprivation even in a strict monetary sense. How does the statute read? Deprivate, does it say? Do you have a scheme to defraud of money or property? A scheme to defraud for obtaining money or property. But we don't disagree that there needs to be some deprivation to the insurer. We just think that's clearly satisfied here because they lost their right to decide how this commission money was spent. They were forced to spend it on something they didn't want. But back to the point about the record evidence. There's testimony in this record that the way that universal life insurance works is that if the insurance company receives more money in premiums than they owe in commissions, they put that excess into the cash value of the policy for the benefit of the insurer. Now, Mr. Bazemore raises some disagreement with that, but I think any reasonable juror would agree that it's not the benefit of the insured. It's effectively the investment component of their policy. And that kind of leaves you at a net-net in terms of premiums in, commissions out the door. But you need to look at the record as a whole in an evidentiary sufficiency challenge, and there's testimony here that part of that premium, in addition to going to the cash value of the policy and paying the commission, also had to be used to pay the costs of servicing the policy. So much so, in fact, that the incoming premiums fully cover the commissions just when he takes into account the amount of premiums that need to go to the cost of servicing the policy. Based on that evidence, a reasonable jury could clearly infer that at least one penny is coming out of these insurers' own pockets isn't created by Mr. Bazemore's fraud, and that's enough to show a deprivation even in a strict monetary sense. And to the extent that we're going to trace money in the manner that Mr. Bazemore says, because under his view, it seems to be the mail fraud statute asks a general question. Is more money going in than coming out? If that's the relevant standard, we also have to consider the fact that issuing a policy requires the face amount of policy to be put into reserves by the insurance company. That's not going out. That's only in reserves. It's not money they can spend on anything but the death benefits. They still got it. They have it, but it's useless to them. And the commissions were paid before any of that, of the premiums, were used for reserves. I'm not sure that that's clear from the record. I'm not sure it's clear when exactly the commissions were paid. Okay, Mr. Armani. Thank you, Your Honor. You've made a fine argument, and you've finished it. Mr. Page, we'll hear from you. It is clear that there are people who have recognized a right to control one's own spending as a cognizable theory of mail fraud. But that is the right to control money or property with which the victim starts out the process. All right, where do you get that? I'm sorry? Where do you get that? Those are the facts in all of the cases cited by the government. The hiring fraud cases, the employer begins with the money and then is defrauded into paying for an employee that they don't want. And then there's the arms cases where the victim is an arms manufacturer and there's a misrepresentation about the indisposition of the goods. In those cases, the victim begins with the property and is defrauded into giving it away on terms they don't want. They don't suffer a monetary loss, so maybe there's an intangible right not to give away your own money or property on terms you don't choose, even if it doesn't give you pecuniary harm. But in all of those cases, the victim begins with the property. There is a right to control how you spend your money. There is not a right to control how you spend somebody else's money or money that the defendant brings. But if you have an automobile, an antique automobile that's worth $100,000, and somebody comes up and says, I'll give you $100,000, here's $100,000. I don't want to sell it. Here's $100,000 and I take the car. You can have $100,000. I mean, the person who owned the vehicle has been deprived of his property, hasn't he? Absolutely, but you began with the car. What? But you began with the car. We wouldn't say that a person has a property right not to act as a pass-through for property that they don't even begin with, which is what the situation is here. Materiality is one element of mail fraud, but it's not the same as a scheme to deprive. There is no scheme to deprive the insurance companies of their property merely because they wouldn't have issued the policies. They wouldn't have paid the commissions without the misrepresentations because those commissions didn't start out as their money. I would like to answer the government's argument that they have to put money in reserves on the policies. There is no evidence in the record that the insurance companies were bumping up against the reserves in these cases as such that they had a limited number of policies that they could sell. There was some evidence that they put money in reserves, but none that indicated that there was any kind of bottleneck there. So the idea that Mr. Basemore was depriving them of a chance to issue other policies is not supported by the record in this case. It would just be an inference out of no evidence. Finally, I want to address the government's argument that the cash value at administrative expenses of the policies might have been equal to the commission. There is no comparative evidence in the case that indicates, no affirmative evidence that indicates that they paid more than they received in premiums in all of their expenses put together. You can look at 1227, 1241, 1413, and 1427, and none of the times when anybody is asked about that question do they say that the expenses plus the cash value is equal to the premiums. If that is an element of the scheme, there simply isn't any evidence of it. And furthermore, there isn't any evidence that they paid the administrative expenses before they received the premiums. Common sense would tell us otherwise, which means the commissions that were paid were simply a portion of the premiums, and so there is no deprivation in that case. Also, there's no evidence that they set aside the cash value such that they couldn't use it. On page 1230, they were asked, do you set that money aside? And Mr. Livingston said he wasn't sure about that. So just as the fact that they have the money in their possession, as Judge Wiener was pointing out, even though they may have reserves, they still have the benefit of the money that is represented by the cash value in this case. Okay. Thank you, Mr. Page. I'll call the next case of the day.